The next argument is in Appeal 3300 from 2007, MacArthur v. Department of Transportation. Mr. Osborne, good morning. Good morning, Your Honor. Please proceed. May it please the Court, this appeal turns on a question of law. Whether a federal agency can terminate one of its employees acting as a union representative speaking on behalf of the union on a subject of a labor dispute that's ongoing between the union and the agency. What is the question of law? Whether the union's publication made by the union representative is protected by both federal sector labor law and by the First Amendment. You're talking about the F-Word? The F-Word publication is the union publication, you're saying? It is. It was a publication made by the union representative on behalf of the union. The union wants to espouse that as its own? Certainly. The article itself says that it is made on behalf of the union. And speech on behalf of the union under both well-settled FLRA law and well-settled First Amendment law is protected. And the union representative who makes that speech cannot be, as a matter of law, subjected to retaliation. Let's dissect it a little bit. If we talk about the federal labor law decisions, they all seem to turn on an analysis of factors dealing with the particular circumstances of the publication in question. So how does that become an issue of law as opposed to a series of fact determinations under a factors-based test? The arbitrator and the agency both committed a number of errors of law, one of which, Your Honor, is in evaluating the facts of the case. A union representative under FLRA law, such as the Oak Ridge case which we've cited, is entitled to very broad latitude. The arbitrator erred, Your Honor. You're not helping me because I'm trying to understand exactly what is the legal question that you say the case turns on. Well, let me try again, Your Honor. The arbitrator erred on a series of issues. The first I'm trying to identify— Does a union— Whether, if I may finish— No, no, no. I'm sorry. I get to ask questions. Of course, Your Honor. Does a union representative get special treatment? Yes. That's what I was just about to say. They're immunized from conduct which would disrupt the workplace? In evaluating their conduct, the FLRA says that union representatives acting for the union in a matter of germane to their union activities are entitled to very broad latitude as compared to federal employees otherwise. Yes, the answer is they are entitled to special treatment. Then the question is, well, what is the latitude? Were they inside the latitude or were they outside the latitude in what they actually did? Agreed. And that sounds like that's a calibration based on very minute fact determinations, and therefore I still don't see the question of law. The first question is the answer to Judge Rader's question, the answer to his question. The second question is this. It has been Supreme Court law and FLRA law for over 30 years. What that law says, Your Honor, is that if a union representative uses intemperate, abusive, or insulting language, that is nevertheless protected both by statute and by the Constitution. Always? Under any circumstances? Yes. No, not always. Only when it's a union representative acting on behalf of the union and speaking for the union. What case holds that regardless of the facts, as long as he's speaking for the union, he can say anything, do anything? What case holds that? No. What the case holds, Your Honor, is that if he is doing something that is speaking that is intemperate, abusive, or insulting, that that is protected activity. What case holds that? Austin and Lynn, two Supreme Court cases. And the FLRA has adopted both of those cases, as have the courts. Well, I'm not sure I can view those cases as being so categorical as what you're saying. In those cases, particular factual circumstances were held to be within the zone of protection. I don't see in those cases a statement saying, regardless of what they said, regardless of what they did, as long as they were speaking for the union, it's per se immune. I was not clear enough in my answer, Your Honor. If what the union representative is doing is speaking in a manner which is intemperate, abusive, or insulting, that is protected. But that's not really what they did here. And that is the standard which the arbitrator refused to apply, and that is another error of law which was reversible. Excuse me, Judge Reardon. But that's not what they found here. They found that it was inappropriate and offensive. It wasn't a question of whether he was advocating his union position or two vociferously. He was causing a disruption in the workplace. He was offending. There was no disruption in the workplace. There was no evidence of that. And not only that, I mean, he does it once, takes it down upon request, and then reposts it in a slightly altered manner. And he was accused of being insubordinate for that, and the arbitrator found there was no insubordination. What motivated the agency's discipline, and to repeat my point on Austin, Judge Michel, the arbitrator refused to apply Austin. The arbitrator held Austin doesn't apply here, and that's wrong as a matter of law. The arbitrator found the broad latitude test doesn't apply here, and that's wrong as a matter of law. Do you find anything offensive in this? Certainly. What the FLRA has said, unquestionably. What the FLRA has said, including in cases where the union representative has used the following language, unlike this case where it was used in the generic and satirical way, you know, the cartoon, where a union representative says to management, you are effing stupid. Where a union representative has said about management, you are an A blank hole. You're drawing from that case the broad conclusion that under any circumstances he could say anything? No, what I'm saying… I thought the rationale of that case was that the union representative, who used that obscene phrase against the management lady, was caused by a sudden surprise where, with no prior warning, she handed a letter that retracted certain concessions that have been made in prior negotiations, and the court held that impulsively, with no chance to think it out, he used a profane phrase. And therefore, my reading of that case is that it entirely turned on the exact circumstances of surprise, provocation by management, no time to think, impulsive outburst by the union representative. But you seem to say that under any circumstances, whether impulsive or not, whether provoked or not, he could say anything as long as he's acting for the union. I just don't see that in that case. There are two cases. Well, that case, Your Honor, holds. Holds. I'm not talking about the particulars, the minutiae. Holds that Austin and Lynn, that standard, that Supreme Court standard, applies to speech by federal representatives, union representatives. That's what that case holds. There are two cases I know, Your Honor, where union representatives have been held to engage in sanctionable conduct, and only two by their speech. One is a case involving the U.S.-Korea services where the union representative put an article in the Korean newspaper which embarrassed the government and which was not even germane to a labor dispute and was reprimanded. That's one of the only two cases where the FLRA has sustained discipline. The other is where the union representative published, and it was another reprimand, not a termination, as in this case. The union representative wrote a letter describing his manager using the most heinous racial epithets, Uncle Tom, House Blank, that sort of thing. Those are the only two cases. I'm not saying it's unlimited, Your Honor. There are two cases, and those are the only two cases, where a union representative speaking on behalf of the union on a matter which is germane to labor has been sanctioned. Well, is it your view that the degree of potential disruptiveness or the reaction of readers of the cartoon of being offended and the other reactions that Judge Rader referred to in his earlier question are somehow irrelevant? They're not allowed to be weighed against the opportunity for the union representative to make his point? I repeat, I revert to what the Supreme Court said in Austin, in which the courts and the FLRA have adopted, and that is where the speech is offensive, abusive, etc., it is protected if that's what the union speaker thinks is necessary to make his point in a rhetorical way. And I can imagine some horrible set of facts, Your Honor, which someone could conjure up. In this case, the use of the so-called F word, which I might add the FLRA and the Supreme Court have both said, standing alone doesn't make any difference. But in this case, the use of the F word, which none of us like to hear. Wasn't Austin a closed-door negotiation? No. Austin was a Supreme Court case, Your Honor, involving a new union newsletter, Letter Carriers v. Austin, which follows Plant Guards v. Lynn. Doesn't the FLRA use these four Grissom standards in determining whether language is in place or out of place? I beg your pardon, Judge Rader, I didn't understand. Doesn't the FLRA use a four-factor test that comes out of the Grissom Air Force Base case? They have a test for flagrant misconduct. And what I was saying to Judge Michel was that in all their cases, they have some of those cases, and we went through them in some length in our reply briefs, the ones the government cited. Most of those cases are cases where it's just an individual employee. It's not the union representative. Put those aside. Of the union representative cases, all the cases they found no flagrant misconduct, except the two that I mentioned to you. Which I posit to you are very, very rare and extreme. But Judge Rader's question was, there are four factors that the labor authority followed. Yes, I think that's right. And the arbitrator made findings on each of those, is kind of where I'm going. He says on the first one, the place and manner, three bulletin boards, viewable by non-union employees, as well as the public, causing some shame to the agency. On the provoked or designed, they said it was clearly a premeditated event. On the third one, whether it was anyway provoked, the arbitrator found no credible evidence that his actions were provoked. On the fourth, the nature, they said the profanity was egregious. It appeared more than 40 times. It was in color, and so on and so forth. In other words, on each of the four, four for four, the arbitrator rules against you. What makes this a legal question, Judge Rader, and not a sifting of the facts issue, is the arbitrator made two serious legal errors before he got to that part. First, that union representatives are entitled to very broad latitude. They're not to be treated the same as employees. The arbitrator said, no, I'm going to treat this union representative as if he was a rank-and-file employee. That's a legal error. That colors everything that comes in. Where is that stated by the arbitrator? By the arbitrator? That's at, I think it's at appendix page 17. The second is he rejected the application of letter carriers versus Austin, which protects intemperate abusive speech, which is likewise erroneous as a matter of law. I'm sorry? What do you mean rejected? He said that Austin Did I overrule the Supreme Court? I don't care. Come on. That's what he said. Come on. Your Honor, what he said, Your Honor, and it's at page, it is at page 11 and 12 of his appendix, appendix 11 and 12. He said Austin and Lynn don't apply. They're tort cases. He said they don't apply to federal employees. He wasn't overruling it. He just made a mistake of law. And that is a fundamental mistake of law. And both treating employees as employees when they're acting as union representatives and saying that Lynn and Austin don't apply are two serious, egregious, and reversible legal errors. Those are errors of law. Those aren't about sifting the facts. And, you know, if you don't treat him as a union representative and you don't give him the protection the Supreme Court allows him, of course when you get done with sifting the facts it comes out a different way. But these are legal issues which Where does he say that the conduct of a union representative is judged as if he were not a union representative but were just an ordinary employee? I just read it from page 17 here of the arbitrator's report. What he's saying is the standards of conduct apply to all employees. The standards contain no exception for an employee acting in the capacity of a union representative. Thank you, Judge Rader. The law says that's what the standards say. The law says a union representative is entitled to very broad latitude. We've cited that case. And he didn't give them any latitude. So that's one error in the other. That's your opinion. But I don't see him saying on page 17 that I have to judge this case regardless of the union status of the petitioner. What it says, Your Honor, is the standards contain no exception for a union acting in a capacity of a union representative. We're not just describing a text. It's true that the standards themselves don't contain any exception for union representatives. He's just accurately describing the nature of the text. And applying the standards as if he's dealing with just an employee, not the union representative, speaking for the union on a matter of union significance on the union's bulletin board relating to a labor dispute. And my red light is on. I'm sorry. Your Honor, if I haven't completely answered your question, I'll wait, but I have run out of time. Yeah. All right. Well, we'll hear from the government. Ms. Bannerman. May it please the Court. I know you don't even get a chance to take a breath, but there's something that concerns me about this. And that is, yes, a profane word is used, but it's used in a very satirical way. What he's really saying is, management is rubber stamping my grievances. And so the cartoon has all these grievances up here, and they're all rubber stamped. And he uses an unfortunate, profane word, but he does it with kind of this satirical—he's making a point. And he's making a point appropriate to be made by a union representative. They're rubber stamping. They're not appropriately dealing with my grievances. If that's the case, doesn't that change the tenor of this a lot? No, Your Honor, because the arbitrator correctly decided this case and issued a number of fact findings that are clearly supported by substantial evidence looking at the totality of the circumstances. It was not just the word, but the fact that it was posted in red ink that would clearly draw attention to it in a place where non-bargaining unit members, members of the public, possibly school children could see it. It was not impulsive, which a lot of the cases, say, protect union speech. It was clearly premeditated. But what about the satire nature of it? He's really saying, you're rubber stamping my stuff. You're not really treating me the way you're supposed to. It goes way beyond the bounds of what any person with common sense would know is appropriate. Well, common sense isn't the test here. The federal labor law and the Constitution is the test. Well, if I may respond, really there are a continuum of cases. There are far more than two cases cited in our brief where courts have held or the FLRA or the NLRB has held that the speech is not protected given the context and the factors considered. Union representative speech? Yes, union representative speech was not protected, not just the CREA case, but the case involving the Air Force 315th where there was a verbal and physical attack of a sexual nature on a supervisor. Well, where there's a physical attack, it seems a foregone conclusion that that would have to be viewed as flagrant misconduct and not protected speech. But we don't have any physical attack here or anything remotely close to it. That's right. So how is the 315th case of any help here? Because it goes into a variety of factors which are fact-based. The place and the circumstances, the nature of the language and or the conduct. That's what Judge Rader's questions are directed at. This is not mere satire. This falls along the line of the case, for example, even where a statement of a supervisor being a loose cannon was not protected. Well, why do you say it's not satire? I can't follow you. It seems to me it's plainly satire. Even if it's viewed as satire, given the fact that it was deliberate, Mr. McCarthy. Let me give you a hypothetical. Suppose that if instead of using the obscene phrase as the stamp on all those papers in that cartoon, the stamp said, Denied, although never read. Denied, but not analyzed. Denied without consideration. If it said those things, would the cartoon justify firing this employee? That possibly might not have. But on appendix page 14. Wait a minute. So you think that it's the fact that the complaint used an obscene phrase that makes it unprotectable. It's the totality of the circumstances. But when we dissect it, you seem to agree that if he had only omitted the obscene phrase, the cartoon would have been okay. No, not necessarily, because these employees, and Mr. McArthur is an employee subject to the standards of conduct. Section 12 says. The issue isn't whether the standards of conduct apply to him. The issue is whether he gets any protection that a regular employee wouldn't get because he's the union representative and acting as such when he posts the cartoon. So we need to get some sense of what's the proper scope of protection for speech by a union representative. And you seem to be saying, well, whatever it is, it can't include profanity. The profanity is what kills it. And that's hard to accept in light of the cases where profanity was held to be okay. In this case, Your Honor, Mr. McArthur was not disciplined for the profanity he used in the meeting with Mr. Van Bavel. It was a private meeting. We're only talking about the cartoon. No one said anything about the meeting with Van Bavel. We're talking about the cartoon posted twice in two different forms, first on one bulletin board in the building, later on, I think, three bulletin boards in the same building. We all know that it's a secure building, but there are occasionally vendors there. Sometimes they're tours. Sometimes the tours include schoolchildren. Non-union members have a chance to walk by the bulletin boards as well as union members. We all know that. Those are all undisputed facts. But so what? Well, on page 16 of the arbitrator's award, the arbitrator found as a fact finding that this cartoon had a demonstrable adverse impact on union management relations because it attacked the integrity of the agency's HR office. What's wrong with that? Why wouldn't that be an appropriate thing for a union representative to do in a circumstance if it's true that these grievances were all being blown off and not actually adjudicated but just denied without even being read? If that were what the facts were, why wouldn't it be quite appropriate for the union representative to post cartoons or otherwise communicate extreme criticism and high disrespect for that behavior? Because the government as an employer has more authority than perhaps private sector to maintain order and respect for its supervisors on the job in order to provide efficient services here, air traffic control. Well, that's what you're saying. But it's not clear that union representatives can be fired for making disrespectful statements to or about management, at least if there is some rational basis for the statements. Maybe they couldn't make something up out of the blue. But if they're responding to management conduct, it seems to me they are protected, at least in some circumstances, even if they're saying things that are profane or disrespectful or upsetting or viewed by certain people as rude and offensive, etc. There are three sources of authority that support the FAA's decision to terminate Mr. McCarthy, and they are found at page 38 of the appendix, the standards of conduct. At page 45 of the appendix… Mr. Osborne doesn't challenge the authority of the FAA to fire people, including union representatives. He simply says that this particular conduct of posting this cartoon was within a zone that under the case law is a protected zone. Austin, upon which he relies, says nothing about agency bulletin boards that it provides to the union and the standards that apply when an agency provides a bulletin board for a union to use. Austin was in an organizational context. It was a union newsletter to its members listing names of scabs in the context of a strike. Austin has really nothing to do with this case. It's the FLRA, Grissom Standards, and other cases that look to the facts of a case that governs. No one's complaining about whether you can look to the facts of the case. His argument is that even looking at the facts of the case, decidedly looking at the facts of the case, he says it's within the zone of protected speech under the precedents. Well, we have cited any number of cases, and far more than two, that a situation like this that are supported by the facts is way beyond a zone of reasonableness. The cases in which… Well, that's what we have to decide. See, it doesn't help us if he says it's within the zone of protection and you say no, it isn't. That doesn't help us at all. We need to be shown, as a matter of precedent, where the boundaries of the protection are. Well, that's where, Your Honor, one way to view it is on a continuum. A simple case where there would be protected speech would be something that's impulsive, not overheard by other people, behind a closed-door meeting, provoked by management. You don't have that here. He doesn't claim you have that here. He's not claiming a provocation. He's just saying that in the circumstance that occurred in late September and October in Anchorage at the FAA En Route Control Center, that this cartoon was a protected form of protest against, first, the delay, second, the lack of oral hearings, and third, the form letter used to dispose of these complaints without analyzing their individual merit or lack of merit. So he's complaining about that by posting the cartoon. So what is it about it that takes it out of the zone of protection as you think the zone exists? It's exactly what the arbitrator concluded and found on page 13, that this was deliberate. Mr. McCarthy. He's agreeing it's deliberate. That's not contested. Of course it's deliberate. He posted it. He later amended it. He reposted it, not in one place but three places. Of course it's deliberate. No one is questioning for a second that it's extremely deliberate. But he says that doesn't make any difference. It's within the zone of protection because of the circumstances. And you say, well, it's deliberate. But that's not responsive to the argument. He's ignoring all of the case law from the federal arbitration. Your point is that deliberate is one of the four factors. One of the four factors as compared to impulsive. And so it does factor into the test that was applied by the arbitrator. It's a factor. It attacked the integrity of management, which violated the standards of conduct, which is contrasted to other cases. What is he supposed to say? They're doing a wonderful job. They're rubber stamping all these grievances. But it's fine. It's okay. His very job is to complain about it. His job is an air traffic controller, and he's an employee as well as a union representative. And I'm sure there are a variety of ways that could be protected. He picked one that was not protected given the standards and the factors that the Grissom and other fora has said. The cartoon is at 36 and 37, and there's a picture of a gentleman there. Is there any suggestion that that picture is meant to depict a particular individual? Or is that just a generic cartoon figure, sort of a grumpy-looking man with glasses and a long chin and all? There was testimony at the hearing by Mr. Valle, who was the first-line responder with FAA management, that he viewed it as an attack on him and an attack on HR. But there hasn't been an argument that the gentleman in the cartoon is meant to be an actual sort of depiction of Mr. Valle. He's not supposed to look like him. Perhaps not in physical appearance, but on the desk it says Alaskan Region HR LMR Office. That's the other thing I was going to ask you. How many people were in that office? I think there were over a hundred-some-odd bargaining unit members. No, no. I mean, how many people were in the… The HR office? Yeah. Well, Mr. Valle was the first-line responder. There's no evidence in the record of how many. There was a Mr. Napier who was also an HR person, so at least two, but I don't know if there were more. But there is evidence in the record that the arbitrator relied upon that Mr. Valle reasonably believed it was an attack upon him and the integrity of the HR… Of his unit. Why does that take it out of the zone of protection? Suppose it was exactly an attack on their integrity and intended as an attack on their integrity. Why does that take it out of the zone of protection? Because under the FAA Standards of Conduct Number 12, an employee, and these standards do not exclude union representatives, are not permitted to make… There's no inconsistency here. Well, assume there is an inconsistency. The personnel manual says one thing, and assume the labor law says something else. Don't you have to agree that the labor law would trump the agency's own personnel manual? Not necessarily, because Mr. MacArthur, along with all the other employees, are bound by this. Standards of conduct… Yeah, but the agency is bound by federal labor law. So if there's a split, and the agency wants to have a certain rule banning certain activity, but the federal labor law prohibits that activity, it seems to me the federal labor law would have to trump the agency's preference. Well, we respectfully do not agree, Your Honor, because these standards and the collective bargaining agreement, which is a contract between management and union, governs Mr. MacArthur here. If I could quickly get to the penalty, Mr. MacArthur… There was no argument about penalty by opposing counsel, was there? In his brief, there was. Well, and in your brief, there's a response. So let's just leave that issue to brief versus brief, since it wasn't orally argued. Fine, thank you. All right, thank you. Mr. Osborne, we'll give you two minutes for rebuttal. Let me try and hustle through a couple of points here. Counsel didn't do this purposely, I'm sure, but Mr. Valley is a facility manager. The HR office is in a separate building. He wasn't working for HR. The cartoon that goes after the HR office, Mr. Valley is a facility manager, and they're in separate buildings in Anchorage, and there's evidence in the record for that. I'm sure that was not a purposeful mistake that she made. But he couldn't have been directed at the target of it because it was directed at HR, which is a whole separate operation in Anchorage. Let me just, again, review the legal errors that were made. Now, don't repeat. Okay. If there are new points that could be made to respond to what she said, go ahead and make those points. Austin controls. My opponent said that she thought Grissom controlled the FLRA case. Well, if you read Grissom, it says Austin controls. And we're back to where we started. In Austin, letter pairs versus Austin control, everything on the federal sector side. On the constitutional side, the controlling case is the Virginia Pharmacy case, which we said, which we cited, which is labor and management speech about a labor dispute was constitutionally protected. What is most troubling about this situation and what is most important about this case is this. The agency wants to act as the editor for the union's newsletter to tell the union what it cannot criticize in its newsletter and to enforce its editorial policies against the union by terminating the writer. I didn't know that we had a newsletter dispute here. We have a cartoon dispute. Your Honor is correct. They want to be the editor of the union's bulletin board and to enforce their editorial policies if they think they're too critical by shooting the messenger and terminating the spokesman. It's not just the individual here who lost his job who has a lot at stake here. There are 350 facility representatives throughout the federal sector representing this union and thousands. According to my opponent's argument, the agency can write a standard of conduct telling the union what it can and cannot put on its bulletin board. That cannot be true. That's why this case is so important and that's why it's an issue of law, not an issue of fact. Thank you both. We'll take the case under advisement.